## Illinois Central R. R. Co. v. F. Schmitt, by His Next Friend.

1. RAILROADS—*Duty to Licensees Traveling Alongside of Track.*— Toward the public, traveling on a roadway alongside of their tracks as licensees, rather than by virtue of any legal right, the railroad company is not required to exercise any greater care than toward those traveling on a public highway parallel to its tracks.

2. SAME—*Statute Requiring Bells to Be Rung and Whistles Sounded.* —The statute requiring bells to be rung or whistles sounded applies only to trains approaching crossings.

3. SAME—*Recovery for Injury, When Violation of Statutory Require- ment is Cause.*—It is only when the violation of statutory requirements is the cause of the injury that damages can be recovered on that account.

4. MASTER AND SERVANT—*Not Responsible for Act of Servant Done Through Mistake in Judgment.*—An act done through a mistake in judgment is not a negligent act, and for an act so done by the servant, the master is not responsible unless he has failed to exercise reasonable care in selecting the servant.

**Trespass on the Case.**—Appeal from the Circuit Court of St. Clair County; the Hon. SILAS COOK, Judge, presiding.   Heard in this court at the August term, 1901.   Reversed and remanded.   Mr. Justice CREIGHTON dissenting.   Opinion filed March 3, 1902.

KRAMER, CREIGHTON & SHAEFFER, attorneys for appellant; JOHN G. DRENNEN, of counsel.

M. W. BORDERS and J. M. HAMILL, attorneys for appellee.

MR. PRESIDING JUSTICE WORTHINGTON delivered the opinion of the court.

This is substantially on all fours with the case of William Klein v. appellant, reported in 95 Ill. App. 220, which case was reversed and remanded at the February term, 1901, of this court.   If that decision was right, a like decision should now be rendered.

The accident occurred in Belleville, between six and seven o'clock P. M., February 3, 1900.   It was not caused by a collision in attempting to cross appellant's tracks, but was caused by the uptilting of a beer wagon driven by appellee, with Klein as a companion, over a narrow roadway, adjacent to appellant's tracks.   The uptilting was occasioned by the sudden swerving of the horse, through fright at the blowing of the whistle and discharge of steam upon meeting two freight cars pushed by an engine, thereby throwing both Schmidt and Klein under the trucks of the car next the engine, which crushed a leg of each, so that amputation was necessary.

Main street in Belleville runs east and west.   South of and parallel to it, in their order, are First, Second, Third, Fourth, Fifth, Sixth and Seventh streets.   Crossing these streets at right angles, running north and south, starting

from the east, are Illinois, Spring and Richland streets. The freight depot of appellant is located at the intersection of Illinois street and Seventh street. Extending in a north-westerly direction from the freight depot are switching yards and seven tracks. The center track is the main track. Southwest of it are three tracks and northeast of it are three tracks. The track next northeast of the main track is the passage track; northeast of it the scale track, and northeast of this is No. 4 track.

Between Illinois street and Richland street, neither Sixth nor Seventh street is used as a thoroughfare. There is nothing in the evidence to show that these parts of streets, although platted, have ever been maintained as streets by the city, while it does appear that they have not been traveled as streets for over twenty years, if they ever were.

The accident occurred on a roadway between the main track and the passage track. Starting from the locality of the depot, the passage track is about sixty feet from the main track, but it approaches the main track going to the northwest, until the roadway between them is only about fourteen feet wide. This roadway is maintained by appellant, and is used by its servants and by persons who receive or deliver freight at appellant's depot or freight cars, and by the public generally who see fit to travel over it. Except where it passes over streets, the roadway is on appellant's land.

On the night of the accident, appellee, with Klein as a companion, drove a one-horse beer wagon, with a keg of beer, from Main street, down Illinois street to Seventh street; thence northwesterly along the roadway between appellant's main track and the passage track to Sixth street; thence along Sixth street a short distance to where the beer was delivered. Returning by the same way, appellee met appellant's cars about eighty-five feet east of Richland street and 125 feet from where appellant's tracks cross Richland street, at a place where the roadway was fourteen feet wide from track to track. Appellee could have returned by either of two shorter routes. One of these was

by driving north on Richland street to Main street. The other by driving north on Richland street to Fifth street; thence east to Illinois street; thence north to Main street. By so doing he would have avoided appellant's tracks, except where he crossed them on Richland street. Instead of this, he drove on the roadway between the tracks leading southwest toward the freight depot, thereby selecting a route which required him to travel a block south and a block back north, which two blocks' travel he could have avoided if he had taken either of the shorter routes.

It was a dark, rainy night, " awful dark," as described in evidence by Klein, appellee's companion. Appellee was familiar with the streets, the roadway and the switching yards. He knew that cars were liable to pass at any time.

It is insisted that if appellee had exercised ordinary·care and prudence he would not have driven on the roadway between the railroad tracks.

Whatever we may think as individuals, of the prudence of one, who, on a dark night, drove a wagon through a switching yard over a fourteen-foot-wide roadway, where he was liable to meet cars at any time, when a safer and shorter route could have been taken, we are not warranted under the rule laid down in numerous decisions, in saying that to so drive was negligence in law, when two juries have said by their verdicts that it was not negligence in fact. That rule is stated in Hoehn v. C., P. & St. L. R. R. Co., 152 Ill. 229, as follows:

" If the conduct of the party charged with negligence, or whose duty it is to use due care, is so clearly and palpably negligent that all reasonable minds would so pronounce it without hesitation or dissent, then the court may so pronounce it by instructions to the jury."

The finding of two juries, under the facts in evidence, that selecting this return route was not negligent in fact, takes this case out of the class in which, by the rule cited, a court may say that it was negligence in law.

Appellee was sixteen years old, and was driving a horse that he believed was gentle and safe, although meeting cars.

There are eight counts in the declaration. The first

count charges that defendant carelessly drove and managed its train.

The second charges that defendant drove its engine at an excessive speed, to wit, fifteen miles an hour, toward Richland street, upon its railroad laid on Sixth street; that it was dark, and that the train had no light or other signal on the end toward Richland street, and that defendant's servants wrongfully let off steam and suddenly made a great and unnecessary noise as plaintiff approached the train.

The third count is in substance the same as the first, but in addition charges that plaintiff was riding in a wagon along a roadway for vehicles, upon the right of way of defendant, adjacent to a railroad track, which roadway was constructed twenty years before by defendant for a public highway.

The fourth count alleges roadway same as third count, the remainder of count same as second count.

The fifth count alleges that the engine was pushing a freight train at a greater rate of speed than six miles an hour, in violation of an ordinance.

The sixth count alleges roadway same as the third, and in other respects is the same as the fifth.

The seventh count alleges an ordinance requiring all railroad companies operating in Belleville to keep the bell continuously ringing on the engine drawing or pushing such trains within the city; that defendant drove its engine upon and along Sixth street, and the public roadway described in third count without ringing the bell; that by reason of this neglect, plaintiff was not warned of the approaching train until it was almost opposite plaintiff, and by reason thereof the horse suddenly turned, etc.

The eighth count charges that appellant's servants wantonly, maliciously and willfully drove the locomotive at a high rate of speed; that they wantonly and willfully pushed the cars in front of the engine without any light or other signal on the end of the car next Richland street; and they wantonly, willfully and maliciously let off steam and blew the whistle and thereby frightened the horse, etc.

Defendant pleaded not guilty.    Verdict and judgment for plaintiff for $7,500, from which defendant appealed.

The evidence in the case at bar does not differ materially from the evidence in the Klein case, *supra*, except, perhaps, in two respects.    It is fuller as to the use and maintenance of the roadway by appellant, and as to why it was maintained by it as a roadway.    It also makes uncertain how the brakeman carried his lantern on the end of the car next to Richland street, and as to whether it could be seen as carried, by those meeting the cars.

The roadway was used and maintained by appellant to afford access to its freight trains and freight depot by those receiving or delivering freight.    It ran through its switching yards, over appellant's land, except where streets were crossed, and it was necessary that it should be kept in condition for those doing freight business with appellant. It is true that the public had used it as a thoroughfare without objection for over twenty years, but there is no evidence that the city of Belleville or the public, ever exercised or claimed the right to exercise any right over it. There is evidence that appellant did exercise control over it.    At one time it narrowed the open space between the tracks for this passageway, from sixty feet at the intersection of Seventh and Illinois streets, to fourteen feet at Sixth street.    It alone kept it in repair.    This is shown by appellee's witnesses as follows:

Edward Dewein:

"There is a traveled way running up diagonally towards the southeast, through the railroad property, that is kept up by the railroad company for freight and traffic hauling through there.    They deliver freight to the company and haul it away.    There is not room for two vehicles to pass there in that highway;  *  *  *  that is between Richland and Spring streets.  *  *  *  It is used by the public in dealing with the company."

Peter Chuse:

"The tracks were originally where the road is; one track ran right to the depot where the roadway is, but they put that further north.    Before these tracks were changed this

travel was right north of the track; there were originally
two tracks; one has been moved. It ran right along parallel
with the main track and down across Richland street. It
was as close as they could get it and allow the cars to pass
without colliding. They afterwards changed it and threw
the track further north of this track where it now is, and
the roadway ran north of the track; that was ten or twelve
years ago that travelway was north of the track. That
portion of the travelway which is north of the main track
is where the track used to be."

Fritz Kritschmer:

" There has been some change there in late years. I
believe they changed the tracks."

Nicholas Meyer:

" They have changed them some. They had a track for
freight trains that ran right west here, northwest of the
freight depot; a spur track right along next to the main
track that used to be the main track; that has been moved
further north to the warehouse. I could not tell when
they moved it. When that track was north of the main
track, the travel was right north of that spur track, where
the spur track used to be, from Richland street, where this
track used to be."

Adolph Fifel:

" I know that spur track that used to be there; it is
moved way over north. The main road is now where that
track used to be; the travel is where the track used to be."

Thomas A. Thompson:

" There is a traveled way now next to the main track
where that spur used to be; that is the same traveled way,
only they have put in these tracks. The spur right along
by the side of the main track has been moved further
north, and where that track used to be, alongside of the
main track, that is filled up and prepared for travel, but
this is the same roadway."

Joseph Manch:

" The one on the north side of the main track has been
shoved over to the north. They travel now where that
track used to be; it forms a part of the roadway now."

Louis Graner:

" That portion between Richland and Spring, marked in
brown, is used by the Illinois Central people to get up to

their freight cars on the line situated alongside of it. It is kept open there for that purpose, for travel, so that they can get to their trains, and the public who are dealing with the Illinois Central people can go to the cars; they can come out that way down to Richland, or they can come from Illinois street and get alongside of the cars that are standing there."

Louis Gebhard:

" The company uses that traveled way so that people can unload goods and load goods; shipping goods, loading goods and unloading goods."

Edward Fifel:

" There is a travelway running along this strip marked in brown; the railroad company use that for their own wagons; for hauling freight; everybody uses it; the public use it in dealing with the railroad company; they take freight into the cars and out of the cars."

Fritz Kretschmer:

The railroad always repaired that travelway. I know they use it, too, to unload and load up in their dealing with the public in receiving and delivering freight."

Nicholas Sauer:

" The company uses it for hauling freight in and out of cars."

Henry Rose:

" The company used that roadway for loading and unloading freight; they run wagons in there to load up the cars. The company keeps it up, but uses it for that purpose."

Thomas A. Thompson :

" I rode on the busses and went on a part of this traveled way. The railroad company used it for unloading grain, lumber and everything, and the public would use it in taking freight to the railroad or away from it."

Henry Wasen :

" The railroad company makes use of that traveled way. They load up and unload stuff. The public and everybody goes over there to take freight off of the tracks. I have seen them take freight through that way and come in below and load."

All the above are appellee's witnesses.

J. J. Heidinger, witness for appellant, who is agent for

the company at Belleville, and has been for the last sixteen years, testified :

" I observe that portion of the map which is colored brown. We call that the wagon track and use it to load and unload freight on and off the cars. Persons coming from Richland and Spring streets can come in on this driveway and they can get in equally as well from Illinois street. This travelway is used for the purpose of wagons to load and unload freight. The public drive in there some. We have invited the public to use that to transact business with the company. There never was an invitation extended to the public to use this roadway except to transact business with the company. There was no agreement by which the company agreed that the public should go along the roadway."

Q. B. Heidinger, yardmaster for appellant :

" That brown roadway is for the company's purpose to unload cars, but they do not unload further down there; that place is rather narrow; the cars usually stand along the tracks number 1 and 2. In dealing with the company, they use this travel for loading and unloading; they frequently come from Richland street and Spring street and Illinois street."

This evidence does not show that this roadway is a public highway in the sense of being a highway that belongs to and is under the control of the public. It does show that the public generally used this roadway as licensees, rather than by virtue of any legal right. In using it they were not trespassers, but they used it under the conditions which surrounded it and caused its maintenance. Toward the public, traveling on such roadway alongside of appellant's tracks, appellant was certainly not required to exercise any greater care than toward those traveling on a public highway parallel to its tracks. To the public so traveling, and not about to cross a railroad track, a railroad company owes no duty to ring bells, or to display lights.

Bells are required to be rung to warn persons against crossing tracks when trains are approaching. They are not rung to warn persons against driving on a highway adjacent to tracks. Trains are limited in speed to prevent collisions at crossings. The statute requiring bells to be rung or whistles sounded, applies only to trains approaching

crossings. C., C., C. & St. L. v. Halbert, 179 Ill. 196; Blanchard v. Lock, 126 Ill. 416; L. E. & St. L. C. R. R. Co. v. Lee, 47 Ill. App. 384; Maney v. C., B. & Q. R. R. Co., 49 Ill. App. 105.

Nor does section 202 of the ordinance of Belleville apply to two cars that are being switched in appellant's yards.

This section 202 is as follows:

" If any person or corporation operating any railroad into or through this city, shall run or cause to be run in or through this city any railroad passenger train faster or at a greater rate of speed than ten miles an hour, or any other train faster or at a greater rate of speed than six miles an hour, such person or corporation shall be deemed guilty of a misdemeanor."

Cars switched over appellant's right of way, or in appellant's switch yards, in making up trains or in distributing cars from trains, do not constitute a train as that word is used in the ordinance.

With reference to the question of the location of the lantern held by the brakeman who was on the end of the car toward appellee, the evidence is contradictory and confused. It is clear that the brakeman had a lantern on the end of the train. Klingenfuss, the brakeman, testifies:

" The light was hanging down over the end of the car. I had a regular railroad lantern. It was not hanging over the end of the car. My feet were hanging over the right-hand side of the car on the north end and I was sitting just south of the hand-hold. I had the lantern right beside me in my hand. There was nothing that I know of to obstruct the view of that lantern down toward the north."

In cross-examination he testifies:

"Was on the right-hand side of the car going to St. Louis. The lantern was in my right hand. It would throw my legs in between the lantern and the boys."

In re-direct:

" My feet was hanging on the north side of the car. When you are shoving cars ahead of you it is rulable for a man to sit on the front end of the car so that horses of any vehicle coming along can see you. I was there for that purpose. I was sitting on the end of the car and held the lantern down towards the side of me. There was no part

of my body hiding the light from people on the driveway that I know of."

The engineer testifies that the brakeman waved a lantern across the top of the car as a signal to stop and that he answered it by two blasts of the whistle. "I could not see the man (the brakeman), it was so dark; but my best judgment is the light was on the front end of the car. I saw him swing the light across."

Appellee and Klein testify that they saw no light. That the brakeman signaled the engineer by his lantern, and that the engineer gave two blasts of the whistle by reason of the signal is not disputed. If the signal was by waving the lantern across the top of the car next to appellee and his companion, and they were looking toward the car, close as the evidence shows they were to the car, they must have seen the lantern. It is also in evidence that the headlight of the engine was between it and the box car it was pushing. As the distance from the headlight to the boys could not have been, under the evidence, more than 120 feet, and as the engineer testifies, the reflection would be "down and out," it is hard to understand how appellee could have failed to see its outward reflection. We do not deem it of importance, however, to discuss at length the alleged failure to ring the bell, or to display a light, or the speed of the cars. It is only when a violation of statutory requirements is the cause of an injury that damages can be recovered on that account. Elliott on Railroads, Vol. 3, Sec. 1264; T. W. & W. R. R. Co. v. Jones, 76 Ill. 314; C. B. & Q. R. R. Co. v. Notski, 66 Ill. 455; Am. & Eng. Ency., Vol. 8, 2d Ed., 421.

That none of these alleged violations charged in the declaration caused the accident, is apparent from the evidence in the case. We said in the Klein case, *supra:*

"In this record there is no evidence authorizing us to say that this accident was caused by the willful or wanton conduct of the defendant. The proof presented by this record shows that the horse swerved because of the signal made by the whistle, and no other cause can be reasonably ascribed. The proof is conclusive that it was the erroneous

judgment of the brakeman which set the cause of the injury in motion, and that the signal was prompted by a desire to avoid injury to appellee. To attribute a willfulness and wantonness by the same act which is intended to save life and property, is an anomaly which can not exist without some further proof."

The evidence in the present case fully justifies this state-ment. Appellee testifies that he "had driven the horse quite' often around trains and railroad tracks." "Had driven around railroads before, near engines in the night time." "He never scared before when it whistled. * * The first car had very near passed; the horse was gentle and did not frighten. The engine let off steam and whistled right sharp. The horse wheeled round immedi-ately and threw us under the car next to the engine. The train was running nine or ten miles an hour. It was about as dark as it could get to be. The wagon was about two and a half feet from the car when it passed."

He did not attempt to drive or purpose to drive over appellant's track where it crossed Sixth street. That street was not used for travel east of said crossing. What appel-lee attempted to do, was to turn to the right from Sixth street and drive down the roadway parallel to the tracks, being the same roadway he had driven over when he brought the beer.

Klingenfuss, one of the switching crew, was on the front of the foremost freight car meeting the horse and wagon, with a lantern. He testifies :

"I saw ahead of us on the track, it looked to me about twenty feet ahead of us—I could not tell what it was at that distance. It looked to me like it was on the track and I gave the signal to stop. The engineer did not respond. I gave him another signal. It was a hard stop sign. He answered it by two short blasts of the whistle. The engi-neer at once applied the brakes. The horse did not seem to be frightened when we passed by."

Counsel for appellee, in that part of their printed argu-ment in which they seek to establish the allegations of willfulness and wantonness, clearly state the cause of the accident, as shown by the testimony of appellee, Klein and

Klingenfuss, the only witnesses who state the circumstances closely preceding it.

Counsel say :

" After the horse and wagon had passed the first car in the train, and after all danger of a collision between the train and wagon was over, and just as the second car in the train came opposite the horse and wagon, when there was no necessity or reason for stopping the train, or giving any signal, as the danger point had been passed, and when the horse was so close to the engine that the train men were bound to know that the sounding of the whistle suddenly would in all probability frighten him, the brakeman gave another stop signal, and the engineer, without being required to do so, and without any reason for doing so, answered it by blowing the whistle. * * * The short, incisive blasts of the whistle sounded suddenly so close to the horse, and the letting off of steam, frightened him, causing him to wheel quickly around to the north, thereby upsetting the wagon and throwing the boys on the track under the wheels of the cars."

And again:

" When the brakeman gave the second stop signal to the engineer and the engineer answered it, the horse was opposite the front part of the second car going along quietly and gently, and the boys had safely passed the danger of coming in collision with the train, and would have been out of danger if the whistle had not been sounded and steam let off almost at the horse's head."

And again:

" Why give any signal to stop when the boys had passed the front end of the forward car, and no collision had taken place between the train and the wagon, and all danger of collision between them was over ? If no signal had been given, in three or four seconds more the train would have passed beyond the wagon and all danger would have been over. The evidence in the record is convincing and conclusive that the proximate cause of the injury to the plaintiff was the sounding of the whistle and letting off of steam."

If the statements of counsel for appellee are true, and that they are is apparent from the evidence, there was no " danger point" in meeting the train unless such " point" was made by the train men. The horse would have passed the

cars just as appellee, from his knowledge of its familiarity with engines, expected it to pass, safely and quietly along the narrow roadway. If this is true, neither the failure to ring the bell, or to display a light, nor the speed of the train, nor all combined, as alleged in the declaration, caused the accident. The unexpected, intervening and proximate cause was the signal of the brakeman and its observance by the engineer. If there had been no light at all, the brakeman would not have seen the horse and wagon and would have given no signal, and the wagon, with appellee, would have passed in safety. If, then, the "sounding of the whistle and letting off of steam " was the proximate cause of the accident, and this was done by the engineer through a signal from the brakeman, given in good faith, though given through an error in judgment, there can be no recovery. Such an act, by either engineer or brakeman, is clearly not a willful, wanton or malicious act, nor a negligent one.

An act done through a mistake in judgment is not a negligent act, and for an act so done by the servant, the master is not responsible, unless he has failed to exercise reasonable care in the selection of the servant.

" The expression ' willful negligence ' involves, obviously, a contradiction in terms; for negligence and willfulness are incompatible, since the former arises from inattention, and the latter from design." Buswell on Personal Injuries, Sec. 91; Parker, Adm'r, v. Penn. Co., 134 Ind. 673.

" Assuming that the street railway company employs a competent gripman, motorman or driver, it would not be liable for his mistake of judgment made in good faith, when, in a sudden emergency, two lines of action are open to him, and he chooses the one which turns out afterward not to have been the better means of escaping the catastrophe." Thompson, Com. on Law of Negligence, Vol. 2, Sec. 1381.

Speaking of an instruction given to the jury, the court say in Bellner v. Crosstown St. Ry. Co., 52 N. Y. 56:

" But if they believed that the motorman was endeavoring in the exercise of his judgment to prevent injury to the boy, then there was no carelessness on his part, but merely an error of judgment, for which the defendant could not be held responsible. Upon the evidence it appears that

the motorman was confronted with a sudden emergency, and it should have been distinctly stated to the jury that if, in what he did, he used his judgment, the defendant was not responsible, even if it was an error which brought about the lamentable results claimed." See also Cabenan v. Atlantic Av. Ry. Co., 155 N. Y. 511; Gundy v. St. P. & M. R. R., 52 Wis. 672; Wynn v. Gen. Park N. & E. R. Co., 133 N. Y. 575.

When Klingenfuss, the brakeman, first saw something approaching, he testifies:

" It looked to me about twenty feet ahead of me. Of course I could not tell what it was at that distance. It looked to me like it was on the track."

It may well have so appeared, for the wagon must have been close to the track, as, when it met the box car, appellee testifies that it was two and a half feet from the car. It had turned on the roadway but a short distance, before the accident occurred. In an apparent emergency, calling for such quick decision, it can not be said that the brakeman, in giving a signal to stop, was guilty of negligence, and much less of willful or wanton conduct. Nor can it be said that the engineer was negligent because he answered an emergency signal by two blasts of the whistle, as the rule required, although it may not have been customary to do so in appellant's switch yards. The engine was adjacent to a track traveled by the public. He was signaled to stop. He could not tell in his position why the signal was given. If he had failed to obey it, and appellee had been on the railroad track, he might well have been charged with negligence. If, then, the error in judgment by the brakeman was not negligence on his part, certainly the act of the engineer in obeying the signal of the brakeman, was not negligence on his part.

When appellee traveled through appellant's switch yards, he had no right to expect that a servant of appellant would violate one of its rules, although it may have been customary to do so. He assumed the risks of whatever might be lawfully done within such yards.

Taking the view as to what was the proximate cause of

the accident, as stated by counsel for appellee in their brief, and in which statement we fully concur, there is no count in the declaration upon which, under the evidence, a recovery can be sustained.

The accident did not occur through willfulness or wantonness. It did not occur through the negligence of the brakeman or engineer, but did occur through an error of judgment upon what appeared to be a sudden and serious emergency. It is not charged in the declaration that appellant had not used reasonable care in selecting its servants, or that they were unskillful or incompetent. It is not charged that there was a failure to supply sufficient light, in consequence of which appellant's servants gave signals that they would not otherwise have given, and that such failure for this reason constitutes negligence. Such an allegation would have raised the question as to the duty of appellant to furnish light so as to see if any persons were traveling on a roadway parallel to its tracks and through its right of way.

It is not alleged in the declaration, nor are there allegations from which a court can say as a matter of law, if proven, that it was the duty of appellant to so light this roadway that persons traveling after night might decide whether or not they would drive over it. All allegations with reference to light, are to the effect that there was no light to apprise appellee of the approach of cars. There is nothing in his evidence which indicates that appellee would not have returned the way he came if he had known that by so doing he would have met cars. When he turned down Illinois street from Main, with First, Second, Third, Fourth, Fifth, Sixth and Seventh streets to cross before he started in a northwesterly direction to deliver the beer, he could not have known whether or not cars would be met on this roadway, but took this route evidently without reference to such meeting. If the whistle had not sounded and steam escaped, he would have returned safely the way he came. He was familiar with the roadway, with the yards, and with the tracks. He had driven about cars and engines and found

his horse to be gentle and safe, although they whistled and let off steam.

It is a fair inference, then, that appellee took this route believing it to be safe, and regardless of meeting cars on the way.

The court instructed the jury, correctly as we think, that the plaintiff could not recover on account of the failure of defendant to ring the bell, as alleged in the declaration; and also that the plaintiff could not recover on the ground that defendant was running at a greater rate of speed than six miles an hour. This instruction excluded recovery on two counts of the declaration.

At the request of appellant, the jury was directed to make the following special finding: " If you find for the plaintiff, state upon what count or counts of the declaration you so find."

To this direction they returned the following finding: " We, the jury, find the defendant guilty of all the counts mentioned in the declaration."

Such a finding indicates that the jury either misunderstood, or willfully disregarded the instructions referred to.

For this reason, and the other reasons stated in this opinion, judgment is reversed and the case remanded.

CREIGHTON, J., dissents.