Alfred Farr, Plaintiff-Appellee, v. Chicago & Eastern
Illinois Railroad Company, Defendant-Appellant.

Gen. No. 10,886.

Second District.
December 29, 1955.
Released for publication January 17, 1956.

Eva L. Minor, of Kankakee, for appellant; Patrick C. Mullen, of Chicago, of counsel.

Donald D. Zeglis, of Momence, and Dyer and Dyer, of Kankakee, for appellee.

JUSTICE EOVALDI delivered the opinion of the court.

For a second time, this case comes to our Court. In the first appeal judgment in favor of plaintiff in the sum of $6,250 was set aside for the failure of the trial court to withdraw from the jury the wilful and wanton counts of the complaint (3 Ill.App.2d 209 (Abst.)). In the second trial the jury again returned a verdict in favor of plaintiff, this time in the sum of $3,250, upon which the court entered the judgment from which this appeal is taken.

Originally there were four counts in the complaint, but on the second trial the case went to the jury on

Count II, the other counts having been dismissed by plaintiff.

Count II alleged in substance that the plaintiff was at the depot of defendant in Momence on June 13, 1951, for the purpose of unloading mail from defendant's train No. 14, due to arrive and stop from the south on the east track of defendant's railroad at approximately 5:50 a. m. (CST); that the plaintiff was lawfully on said premises and at all times mentioned in the complaint in the exercise of due care for his own safety; that at approximately 5:50 he crossed the double track of defendant on the crosswalk provided for that purpose from the west to the east for the purpose of unloading mail from defendant's train No. 14 due from the south on the east track at said time, and thereupon defendant's fast train No. 6 proceeding northerly at a great rate of speed struck an intended passenger of defendant, Alice B. Buntain, causing her body to immediately strike and injure him.

It was further alleged that defendant was negligent in one or more of the following:

(a)   running its northbound passenger train, No. 6, on its easterly track through its depot in said city at a dangerous and unreasonable rate of speed, to-wit: 80 miles per hour.

(b)   running its said train No. 6 at said dangerous and unreasonable rate of speed at approximately the same time that its passenger train, No. 14, also northbound on said easterly track, was due to stop at said depot.

(d)   running its northbound passenger train, No. 6, on its easterly track through its depot in said city at a dangerous and unreasonable rate of speed, to-wit: 80 miles per hour, at approximately the same time its passenger train, to-wit: No. 14, also northbound on said easterly track, was due to stop at said depot without providing adequate warning to plaintiff and intended

171

passengers of the approach of said fast train, to-wit: defendant's train No. 6.

Plaintiff alleged that by reason of such conduct, he was permanently injured and disabled and was damaged in the sum of $15,000. The defendant's answer denied all of the material allegations of the complaint.

At the close of plaintiff's case and again at the close of all the evidence, defendant's motion for directed verdict was denied. Subsequently, defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and plaintiff's motion for new trial were argued and overruled.

Defendant's theory is that plaintiff failed entirely to prove that immediately before and at the time of the injury he was in the exercise of due care for his safety; that he failed to prove that defendant was guilty of negligence which was the proximate cause of his injuries; that the court erred in denying defendant's motion for a directed verdict and for judgment notwithstanding the verdict; and that the jury was erroneously instructed at the request of the plaintiff.

On the 13th day of June, 1951, and for approximately a year and a half prior thereto, plaintiff was under contract with the Government to carry mail between the post office and the station of the defendant at Momence, Illinois, making some 6 or 7 trips a day to the station 7 days a week. On said June 13, plaintiff went to the station for the purpose of getting mail from train No. 14, a local northbound passenger train which was due to arrive at the depot at 5:51, Central Standard Time, 6:51 Daylight Savings Time. The railroad runs north and south through Momence. There are 2 tracks east of the depot, the east track being the northbound track and the west track being for southbound trains. In order for a person at the depot to board a northbound train or to receive mail from such train, it is necessary to cross both tracks on a board

172

walk, which was directly in front of the depot. The railroad tracks which plaintiff crossed were set in a railroad bed averaging one and one-half feet in depth. The bed was about one foot deep on the east side and a railroad tie or log formed the east side of this road-bed. The east side of the railroad bed was 2½ feet east of the east rail of the east track. Above the bed on the east side, there was an asphalt platform used for passengers and for unloading of mail.

Plaintiff testified that on the morning in question he arrived at the station at about 6:30 a. m. (DST); there were about 15 or 20 other people at the station who were waiting for train No. 14; that, among others, he saw Mrs. Alice Buntain; that a person in the station looking south had an unobstructed view to the south to the curve in the track, which was one-half mile south; as the train came around the curve he heard the whistle; it was about 6:50 a. m. (DST); No. 14, the train he was waiting for, was due at 6:51; when he saw the train and heard the whistle, the people on the west side of the track started across to the other side; everybody started across when the train was seen coming around the curve; he got his cart and started across with it; the reason plaintiff customarily crossed the tracks after the passengers had started across was to avoid hitting them with his heavy cart which had 2 iron wheels and which was about 10 feet long; they crossed on a board walk which was 16 feet wide; plaintiff would run because the cart was heavy and it was easier to push while running; Mrs. Buntain started across a little ahead of plaintiff; about three-fourths of the way across the board walk plaintiff passed her; he was running and she was walking slowly; he thought the train which he had seen approaching was No. 14; he got across the track 4 or 5 feet, gave his cart a shove and started to turn around and got about half way around and he was struck by Mrs. Buntain's body which knocked him against his cart which was east of

173

him breaking his right leg, and causing him other injuries which are not set out in detail, as no contention is made by defendant as to the nature and extent of the injuries. At the time he was struck, plaintiff was completely across the railroad bed and 4 or 5 feet on to the asphalt platform.

Plaintiff further testified that he later learned that the approaching train was No. 6, the fast passenger train which did not stop at Momence and which was due to arrive at Momence at 5:06 (DST); that there was no warning or signal given that the train approaching was No. 6 rather than No. 14; that no mechanical signal was given; and that he knew that there were no railway employees on duty to give such warning until after 7:30 in the morning.

Harry Lambert testified for the plaintiff and said that he was a regular commuter from Momence to Chicago and that he was at the station on the morning in question and was standing in front of the depot when he heard the whistle of the train, and didn't see the train; most of the passengers went across the tracks; he saw Mrs. Buntain walking slowly across the track; that he and Mrs. Buntain were the last ones to cross; and that when Mrs. Buntain was hit, plaintiff was across the tracks, standing 10 feet off the tracks alongside his mail truck. He testified further that he saw the train, just the glance that he had when he turned to his right and saw "that blue thing" on top of him and his opinion was that it was going 100 miles an hour; that he heard the train whistle. He further testified that No. 14 comes in so slowly that you can make 2 or 3 trips across; he knew right away it was No. 6 and never knew it to come within a quarter of an hour of the time that No. 14 was due. On cross-examination the witness testified that he was about 2 feet from Mrs. Buntain when she was hit; that plaintiff was across

174

both tracks before Mrs. Buntain and said witness Lambert started across and that plaintiff was not moving, just standing across the tracks. He admitted that at the first trial he testified that he first said the speed of the train was 100 miles an hour and he came down to 80. The witness further testified that he was present at the inquest held on the body of Mrs. Buntain and that the engineer had the speed recording tape at the inquest; that the witness heard the testimony at the inquest, and that the engineer said the train was going 87 miles an hour. Defendant requested that such testimony be stricken but the court refused.

Alonzo Williams testified for plaintiff that he was employed by the Chicago Transit Authority in Chicago and lived in Momence and went back and forth every day on the defendant's train No. 14; that when he got to the station that morning, there were other passengers there, most of them on the west side of the track; that a train approaching from the south could be seen for a distance of ¾ mile; the witness was standing with other passengers at the north end of the depot, saw and heard the train coming around the bend from the south; the whistle on the train was blowing; 12 to 14 people started to go across the tracks; Alice Buntain got out of a car and started to walk toward the crosswalk; plaintiff picked up his truck and started across; Alice Buntain was on the crosswalk and plaintiff right behind her; plaintiff ran across ahead of her and got 4 or 5 feet over on the asphalt platform, threw his truck ahead and made a slight turn like he was going to assist this woman. Williams further testified, "Then I saw just a flash and the body hurling ahead and the train cut off our view." The witness testified that in his opinion the speed of No. 6 was 80 miles an hour and that when the train came around the curve, he realized from the length of the engine that it was not No. 14. The train was coming very fast, and that helped him

175

to decide it was not No. 14. He testified further that he observed the Dixie Flyer coming from the south. In answer to the question, "Did there appear to be any let up in the speed until the time of the impact?" the witness answered, "Well, it didn't so far as I observed. It didn't appear like that to me."

Laura Jane Dolder testified for the plaintiff that she was a school teacher and was at the station at Momence to take train No. 14 to Chicago on June 13, 1951; that the train was due about 10 to 7; that while she was in the depot she heard the whistle of a train, and thinking it was her train coming, she got out of the depot and walked across to the east side; that the rest of the people went across; Mrs. Buntain was one of the last ones to go across and she was taking her time. She further testified that plaintiff got across the tracks and turned around to help Mrs. Buntain who was almost across and the train hit Mrs. Buntain and her body struck plaintiff while he was on the asphalt platform. On cross-examination she stated that when she made up her mind that it was the No. 6 train, it was probably half way from the bend to "us" and she didn't know how far Alice Buntain and plaintiff were then; that Mrs. Buntain started out ahead of him and he passed her; and it seemed like he motioned her to follow him, he tried to hurry her up by motioning with his hand. "It seemed like that was about the time he started to run. I was watching them. After he motioned her to follow him she kept right on going." She further testified that the whistle was blowing loud and often, almost continuously.

For the defendant, the engineer, Leon Van Lieu, now retired, testified that train No. 6 was a fast passenger train of 12 cars with Diesel engine, which engine was equipped with automatic bell, which was turned on at Danville and was ringing until after the accident. It was also equipped with 2 large horns. The morning

176

in question was a clear, bright day and it was daylight when they went into Momence; that the train was due at 4:06 Standard time and it was one hour and forty-two minutes late, which made it 5:48 Standard or 6:48 Daylight time; the engineer and fireman were each in their places, the engineer on the east side and the fireman on the west side of the engine and that he sounded the horn at the whistling post about a mile south of the station and that he blew the whistle continuously and loud for Momence; that when he was 150 feet from the crosswalk, he noticed the mailman shoving his truck and a lady following him. They started across the northbound track. He blew the distress whistle and set the brakes in emergency and was going approximately 80 miles an hour which was the usual and customary speed through Momence. He testified further that after he saw them 150 feet ahead of him it would have been impossible to stop the train and that he tried to warn them with whistle and the bell. He further testified that it was not unusual for this train to be late those days and it was not too unusual for it to be going through Momence at about that time. The engineer had the speed recording tape which had recorded the speed of the train at the time and place in question and he said that it showed a speed of slightly more than 80 miles, about 83 miles an hour. The tape was in lead pencil and was a little more than 4 years old. On direct examination, he admitted having testified at the inquest of Alice Buntain as to the speed of the train. He denied that he stated the speed of the train as 87 miles an hour as testified to by plaintiff's witness, Harry Lambert.

On cross-examination the engineer testified he did not slow down any for Momence and he knew that No. 14 was due to stop at Momence at 5:51 a. m.—3 minutes from the time he went by the depot with No. 6; that he had passed No. 14 which was in St. Anne on the siding

177

when he went by; that St. Anne is 10 miles from Momence; that he went through St. Anne at 60 miles an hour; that as he came through St. Anne he didn't have the slightest idea that there would be a number of people waiting at Momence; that he never came by there when No. 14 was due before that he knew of; that he had been through there when No. 14 would be on the other main; he admitted that the curve south of Momence was less than one-half mile from the station and that from where he came around the curve he could never have stopped at the station. In answer to the question, "When you first saw what was at the station, you were unable to stop, matter what was there?" he answered, "I could never have stopped from where I could see." He further testified on cross-examination that the defendant set the speed at 80 miles an hour and that he thought that was done by the Interstate Commerce Commission; that his orders came from time table instructions; that this speed of 80 miles an hour was the maximum anywhere on his route and that he was not to go over it according to the time table instructions which were his orders.

The conductor, brakeman and fireman all testified that the whistle was blown almost continuously going into the station, and that the speed of the train was 80 miles an hour, the usual speed through Momence. The fireman said that plaintiff and Mrs. Buntain were 3 to 4 feet from the track when he first saw them about 300 feet ahead of him; that the horn was being sounded at that time; that he was on the west side of the engine and could only see them while they were crossing the west or southbound track; that the engineer applied the emergency at about 150 feet from the walk.

Other people at the station who testified for defendant were Quellie Jenkins, Charles Minton and Paul Jones. They testified to substantially the same facts as the witnesses for the plaintiff. They agreed that the horn or whistle of the train was blowing continuously

and that plaintiff and Mrs. Buntain crossed immediately in front of the approaching train. The witness Minton testified that he called the Tower that morning and was told that No. 14 was late and that when he got to the station he told plaintiff that No. 14 would be late. Plaintiff denied this statement on rebuttal. Arlene Schwark, witness for defendant, testified that she was the court reporter for the Coroner in June, 1951, that she took the testimony at the inquest, and that she did not find anywhere in her notes that the engineer testified that his speed in coming through Momence was 87 miles an hour. On cross-examination she testified that she did not take any statements that were not made under oath, and what the engineer said outside of his testimony, she didn't know.

▮▮▮▮ It is clear from the evidence in this case that Alice Buntain was at the station of the defendant in Momence to take its train to Chicago for a visit with her son. Clara Hankey, one of the witnesses for the plaintiff, testified that she lived at Momence and was acquainted with Mrs. Buntain in her lifetime; that she took her to the train on the date in question and that Mrs. Buntain had a small suitcase; that she was going to visit her son and the train she was to take came into the station close to 7:00. She further testified that Mrs. Buntain was about 76 years old, and that she always helped her out of the car and took her suitcase into the station; and that when she got in her car and went home the train was not at the station, and that there were other passengers there. Passengers obliged to cross railroad tracks to board a train standing at a station have a right to suppose that the railway company will regulate the movements of its trains on the tracks to be crossed with due regard to their safety. Chicago, St. P. & K. C. Ry. Co. v. Ryan, 165 Ill. 88. In that case, the plaintiff did not see the train before he was struck and the proof showed a violation of one of its rules by defendant. The Supreme Court affirmed

179

the judgments of the Appellate and Circuit Courts. It is for the jury to decide under all the circumstances of the case whether it is negligent for a person to cross a railroad track without looking down the track, and whether it is negligent for him to cross without looking more than once. Gills v. New York, C. & St. L. R. Co., 342 Ill. 455; Chicago & A. R. Co. v. Kelly, 182 Ill. 267, 273 (another case wherein defendant violated its rules); Chicago & N. W. Ry. Co. v. Hansen, 166 Ill. 623, 628; Partlow v. Illinois Cent. R. Co., 150 Ill. 321, 327. When we consider the evidence in this case that plaintiff was on the asphalt platform at the time he was struck by the body of Mrs. Buntain, an intended passenger of the defendant, we cannot say as a matter of law that immediately before and at the time of the injury he was not in the exercise of due care for his safety.

As to its contention that plaintiff failed to prove that it was guilty of negligence which was the proximate cause of the injury, the evidence shows that defendant's engineer was driving his train at a high rate of speed through Momence, without knowledge that several persons would be at the station waiting for another train, which travelled slowly, which was due at about the same time that the fast train went through Momence. The engineer admitted that he could not stop his train at the speed he was travelling from the time he came around the curve in order to avoid injuring anyone at the station; and he further admitted that he was violating one of the company's rules as to rate of speed, which applied at all times.

██ The questions of fact in this cause have been passed upon by two juries and both have found appellant guilty of the negligence charged against it. Where two juries have found the issues the same way, we should be slow to set aside the verdict of the jury. Bonnier v. Chicago, B. & Q. R. Co., 2 Ill.2d 606, 614;

Illinois C. R. Co. v. Schmitt, 100 Ill. App. 490, 493; Silberman v. Washington Nat. Ins. Co., 329 Ill. App. 448; Goldstein v. Metropolitan Life Ins. Co., 324 Ill. App. 168; Greer v. Shell Petroleum Corp., 281 Ill. App. 238; Doerr v. City of Freeport, 239 Ill. App. 560; Jenisek v. Riggs, 320 Ill. App. 158; Meier v. Cleveland, C., C. & St. L. Ry. Co., 206 Ill. App. 285; Romano v. Rockford City Traction Co., 230 Ill. App. 402. The question of negligence is one of fact for the jury. Chicago, B. & Q. R. Co. v. Gunderson, 174 Ill. 495, 497; Painter v. Keeshin Motor Express Co., Inc., 297 Ill. App. 557, 559; Russell v. Richardson, 302 Ill. App. 589, 597. Whether plaintiff failed entirely to prove that immediately before and at the time of the injury he was in the exercise of due care for his safety, and whether defendant was guilty of negligence which proximately caused plaintiff's injury, were questions of fact to be decided by the jury.

██ It is urged by defendant that the court erred in denying its motions for a directed verdict and for a judgment notwithstanding the verdict. These motions present the single question whether there is in the record any evidence which, standing alone and taken with all its intendments most favorable to the party resisting the motion, tends to prove the material elements of his case. Seeds v. Chicago Transit Authority, 409 Ill. 566; Lindroth v. Walgreen Co., 407 Ill. 121 at page 130; Gorczynski v. Nugent, 402 Ill. 147 at page 156; Weinstein v. Metropolitan Life Ins. Co., 389 Ill. 571 at page 576. We are not concerned with the weight or credibility of the evidence, but only with the narrow question whether there is any evidence, together with all reasonable inferences to be drawn therefrom, which would justify submission of the case to the jury. Lindroth v. Walgreen, supra, at page 130. From what has heretofore been said on the questions of the due care of plaintiff and of the negligence of the defendant, we cannot say that all reasonable minds would reach a

181

conclusion contrary to the jury's findings. The trial judge properly denied the motions for directed verdict and for judgment notwithstanding the verdict.

■■ Objection is made by defendant to plaintiff's instructions 2, 3 and 4. Eight instructions were offered by plaintiff, of which seven were given by the court. Sixteen were offered by defendant, of which fifteen were given. Instructions are taken as a connected series, and the jury cannot single out one instruction and disregard others, but must take all of the instructions together, as the law. The jury was properly instructed by defendant's instruction No. 8 as to the issues which it was to determine. When we compare plaintiff's instructions 2 and 3 with defendant's instruction 9, it is apparent that if any fault appeared in said instructions of the plaintiff, it was overcome by said defendant's instruction 9. When we compare plaintiff's instruction 4 with defendant's instruction 21, we do not see where the jury could have been misled by the instruction complained of. The jury was amply informed by other instructions given by the court on behalf of the defendant as to the various situations under which a verdict of not guilty would be required, and as to the requirements to be met by plaintiff before he would be entitled to a verdict in his favor. When we compare the three instructions complained of with the instructions given on behalf of the defendant, it appears that the jury was properly instructed as to the law of this case and that it was not confused by the instructions given for the plaintiff. Instructions which do not mislead the jury do not require a reversal, even though they are faulty. McNamara v. Melson, 237 Ill. App. 279, 283; Tierney v. Kane, 133 Ill. App. 72, 74; Rowell v. Chicago G. W. R. Co., 92 Ill. App. 103, 105.

Finding no material error in the record, the judgment of the circuit court will be affirmed.

Judgment affirmed.

DOVE, P. J. and CROW, J., concur.