Byron L. Painter, Appellee, v. Keeshin Motor Express Company, Inc., Appellant.

Gen. No. 39,996.

Heard in the second division of this court for the first district at the April term, 1938. Opinion filed December 13, 1938.

RYAN, CONDON & LIVINGSTON, of Chicago, for appellant; JOHN M. TUOHY, of Chicago, of counsel.

ALFRED ROY HULBERT and HOWARD A. BRUNDAGE, both of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

On issue joined on plaintiff's amended complaint charging negligence the jury returned a verdict finding defendant guilty and assessing damages at the sum of $13,500, on which judgment was entered. Defendant did not offer any evidence nor move for a new trial. At the close of plaintiff's case, and again at the close of all the evidence, defendant requested the court to instruct the jury to return a verdict finding defendant not guilty. The court reserved ruling on the motions and on the instructions presented therewith. After verdict defendant moved that judgment be entered in its favor and against plaintiff notwithstanding the verdict returned, on the ground, first, that there was no evidence whatsoever to show that defendant was guilty of any negligence alleged in the complaint; second,

that the evidence introduced by plaintiff established that plaintiff was guilty of contributory negligence as a matter of law; and, third, that the court should have granted the motion filed at the close of plaintiff's case and at the close of all the evidence requesting the court to direct a verdict for defendant. The court over-ruled all of said motions and this appeal brings the case here for review.

Under the amended complaint it was incumbent on plaintiff to prove that defendant, by its servants and agents, carelessly and negligently drove a motor tractor into violent collision and contact with the front end of the trailer behind which plaintiff was working, and that at and about such time plaintiff was in the exercise of due care and caution for his own safety. This court, in *Gardiner v. Richardson*, 293 Ill. App. 40, decided that in passing upon a motion for judgment notwithstanding the verdict made by a defendant the court should not determine whether the verdict is against the manifest weight of the evidence. Defendant maintains that there is no competent evidence to support the allegations of the complaint. The rule is that negligence and contributory negligence are questions of fact for the jury. If the matter is open to a difference of opinion the jury must pass on it. It becomes a question of law only when the evidence is so clearly insufficient to establish due care or negligence that all reasonable minds would reach the conclusion that there was contributory negligence or negligence. The proposition is aptly stated in *Petro v. Hines*, 299 Ill. 236, 240: "The general rule is that negligence and contributory negligence are questions of fact for the jury, and so long as a question remains whether either party has performed his legal duty or has observed that degree of care and caution imposed upon him by law, and the determination of the question involves the weighing and consideration of evidence, the question must be

submitted as one of fact. (*Chicago, St. Louis and Pittsburg Railroad Co. v. Hutchinson,* 120 Ill. 587; *Austin v. Public Service Co., ante,* p. 112.) Before we can say, as a matter of law, that there was no negligence on the part of the defendant or that there was such contributory negligence on the part of the plaintiff as to defeat recovery, we must be able to say that all reasonable minds must agree that the defendant was not negligent in his acts or that the injury was the result of plaintiff's own negligence." And in *Ziraldo v. Lynch Co.,* 365 Ill. 197, 199, the Supreme Court said:

"A motion to direct a verdict for the defendant preserves for review only a question of law whether from the evidence in favor of the plaintiff, standing alone and when considered to be true, together with the inferences which may legitimately be drawn therefrom, the jury might reasonably have found for the plaintiff." With these propositions the parties are in substantial agreement. It becomes necessary, therefore, to thoroughly consider the facts. Plaintiff filed an additional abstract for the purpose of showing the instructions that were given. The questions as to negligence and contributory negligence were submitted to the jury on instructions about which there is no complaint. Prior to giving the instructions the court had reserved ruling on the motion for a directed verdict. We agree with defendant that the fact that the trial court at the suggestion of the respective parties instructed the jury on both theories of the case, does not preclude defendant from now urging that error was committed in failing to enter judgment notwithstanding the verdict.

The injury about which plaintiff complains occurred on May 21, 1936, in defendant's freight yard or terminal, located between Canal, Clinton and Fulton streets and the Chicago and Northwestern Railroad tracks, in the city of Chicago. Defendant was engaged in the

business of carrying freight by motor trucks. Many of the hauls were to points in other States. At the time of the occurrence plaintiff was in the business of repairing tarpaulins for various trucking concerns, including defendant. He operated a small shop in the rear of his residence and there repaired tarpaulins that were too badly torn to be repaired at the freight yards. For the most part the service he performed for defendant was in the latter's freight yard. The vehicles upon which plaintiff worked were mostly tractor-trailer units. The tractor is the motor vehicle which is detachable from the large cargo-bearing vehicle known as the "trailer." To make a coupling between the trailer and the tractor it was necessary for the latter to meet the former with some force, and in making such coupling, if the end of the trailer was not resting against a wall, it was necessary to place large blocks under its wheels. The trailers having been loaded, if they were not to be taken out until the night drivers came on duty at seven o'clock, they were taken from the loading platform to a point in the yards under the elevated railroad structure of the Chicago and Northwestern Railroad Company and placed against a concrete supporting wall. When plaintiff commenced work for defendant he asked its agent who hired him as to how he should do his work, and was told to "take them as you find them." He understood that the statement meant that he was to go out into the yards, observe the equipment as it came in, and when he saw a trailer that had a tarpaulin that needed fixing, to fix it, and that he was to use his own judgment as to whether he would fix it on the grounds or whether he would take the tarpaulin home. Plaintiff testified that he started to work for defendant in October, 1935; that to make repairs on the canvas covers he would go to the terminal where most of the trailers were and walk along and inspect them; that if there

were any tears or any ropes loose he would fix them right then and there, but would first ask somebody if it was all right to do so; that ''during the course of my work Mr. Mason, general superintendent, and John Viverito, some kind of a supervisor, and John Norden and sometimes a checker, I would ask them if it was all right to repair that tarpaulin; if the truck was going to stay there, or go out; get their consent''; that he would work all over in the terminal, wherever the truck happened to be; that he took the tarpaulins off; that he got to the canvas to do the repairing by climbing up on the trailers, sometimes with a ladder and sometimes he would ''shin'' up; that ''patched'' jobs were done by hand sewing; that he would sit on top of the truck; that on the big tears he would take the tarpaulin off; that the big tears could not be sewn by hand; that he had a power sewing machine at home; that in order to repair the tears and cuts in the canvas he would unloosen the ropes that tied the tarpaulin to the truck proper; that the ropes were located on the outside edge of the tarpaulin and were about 18 inches apart; that the ropes came through an eyelet in the tarpaulin and were about 4 feet long and tied down to a rail; that when he first started to work for defendant, in October, 1935, he earned approximately $100 the first month; that the same increased until he was doing a business with defendant of about $250 a month; that he was doing some other work for other concerns; that his total business at the time he was injured was about $350 a month; that he never operated a tractor or trailer around the terminal; that before the day of the occurrence trailers were moved or spotted about for the purpose of his repair work on them; that on the day of the accident he saw the trailer at about 2:45 p. m. on the east platform; that he noticed ''it was torn and some ropes were loose. The sewing and resplicing of the rope was part of my work. The tear

was along the top rail or side"; that about 3 p. m. he talked to Mr. Witt (foreman of the outbound terminal), who was on the east dock or platform; that he said to Witt, "There is a trailer with a tear in it. Can I fix it?" that Witt said, "No; it is going right out"; that plaintiff asked Witt what time it would be back and the latter said, "About 6 o'clock"; that plaintiff said, "All right; I will wait for it'; that it came back at 6 p. m.; that it was backed up against the east platform; that plaintiff again saw Witt at that time on the east platform; that plaintiff said to Witt, "Well, there is that trailer. Can I repair it now?" that Witt hesitated and said, "Put it over against the back wall," and plaintiff remarked, "Well, if you put it against the wall I can't get at it to fix it"; that Bonelli (a hiker with a tractor, who moved loads around in the yards) was present at the conversation and was standing at the right of Witt and a little behind; that plaintiff did not speak to Bonelli; that the next thing that happened was that Bonelli got off the dock, "evidently to move the trailer"; that plaintiff knew that they were going to park the trailer against the wall; that he went back there to meet them; that he did not have the ladder at the time; that the ladder was under the stairway at the south end of the terminal; that he got the ladder; that he did not see Bonelli park the trailer; that he finally found the trailer about 150 feet east of Clinton street, in the roadway, "which is the north end of the embankment where the Northwestern trains go"; that when he got over there Bonelli was standing on the ground on the right side of the trailer; that the trailer and tractor were connected; that Bonelli unhooked the tractor from the trailer; that ordinarily the trailers were backed up flush against the wall; that this time one end was against the wall and the other end was out about 18 inches; that plaintiff first unloosened the ropes and used the ladder to untie the

ropes; that he then threw the cover up on top; that there was a center bar in the trailer which supported the cover and ran from the front to the back; that the center bar held the tarpaulin up so that it would not sag; that he threw the cover up and sewed two rips; that when he talked to Witt on the dock he said it would take a little over an hour to repair it; that to unfasten the ropes and get up there took about 10 minutes; sewing the rip about 15 minutes; that he then tied the ropes back on the side; that he then went to the rear to repair two ropes (which he had observed while the trailer was at the east dock) needing repair; that the ropes were loose, about ready to pull out of the eyelets; that this portion of the back of the tarpaulin comes over the top of the truck and down about 18 inches and that the ropes run down to the rail, where they are tied; that he was working on the back of the trailer about 15 minutes when the crash occurred; that he did not hear anything before the crash; that he did not see anybody walk around to the back of the trailer while he was working on it; that no one spoke to him; that he ''passed out''; that when the crash occurred he was about 4 or 5 feet above the ground on a step of the ladder; that there were about 2 more steps to the top of the ladder; that he was taken to St. Luke's Hospital; that he was injured on the leg above the knee, and in the foot; that the foot was crushed.

As there is no contention that the damages awarded are excessive there is no need of going into the matter of plaintiff's injuries. The injuries were painful and serious, and permanent.

On cross-examination plaintiff stated that the first time that he was in defendant's yard was approximately March, 1935; that from then until the day of the accident he was in the yard almost daily, and sometimes several times a day, at all hours, in the morning, afternoon and evening; that the busiest time around

the yard was morning and evening, in the morning from 7 to 8 o'clock, and in the evening from 5 to 6 o'clock; that he knew Norden and Bonelli; that he was not familiar with their duties; that he used to consult Witt at various times; that he knew Mason was general superintendent and that Bonelli was a hiker; that he was familiar with the geography of the yard; that he knew where the loading platforms were; that he knew it was a common practice to take a loaded trailer and place it over against the wall; that he did not always know when trucks were loaded; that it was a more or less common practice to shove the loaded trailers against the wall; that the purpose of sending trailers against the wall was to get them out of the way until such time as the drivers came to take them out on the road; that he worked on trailers around the yard since March, 1935; that he formerly worked in the same yard for a Mr. Benke; that after a conversation with Mr. Frazier he succeeded Benke; that he told Frazier he knew the nature of the work that was to be done; that he was capable of sewing and observing the condition of the tarpaulins while the equipment was in the yards; that he was told to go and do the work and take them as he found them; that one tear on which he worked was approximately 15 inches, and the other approximately 6 inches, "right at the top rail"; that the tears were a little to the rear of the center of the trailer; that after the trailer had been placed he proceeded to repair the tears; that he reached the tears by means of a ladder, and climbing the rest of the distance; that in repairing the tears he was on top of the trailer; that at the time of the accident he was through repairing the ropes and was tying them down to the rail; that after the conversation with Mr. Witt in the afternoon he waited around from 3 to 6 hours for the equipment to come back; that it was then backed up to the east dock; that the wall to which it was finally

brought was probably 400 feet from the place where
he was talking to Mr. Witt; that he said to Mr. Witt,
"I would like to repair that tarpaulin," and Mr. Witt
hesitated; that plaintiff did not say anything at the
moment; that next Mr. Witt called out to somebody
and said, "Take that carton out of that truck and put
it over against the wall," meaning the truck; that
plaintiff didn't know whom Witt was addressing; that
he had no further conversation with Witt; that plain-
tiff stood around about a minute, then secured a ladder
and started over to the back wall; that in the course
of the conversation with Witt the latter said, "Park
that against the wall"; that plaintiff said, "If you
park that against the wall I can not get at it"; that
then Bonelli stepped from behind Mr. Witt and jumped
down off the dock and the trailer pulled out. . Plaintiff
stated that in a pretrial deposition he testified that
early in the afternoon when he wanted to repair the
tarpaulin, in answer to Mr. Witt's inquiry as to how
long it would take, he replied that it would take a little
over an hour, and that Witt told him he could not do
the repairing then because the truck was going out at
3 o'clock; that plaintiff then inquired when it would be
back and was informed that it would be back at about
6; that at about 6 o'clock he was waiting around for
the truck to return and that when it did return he
approached Witt and asked whether he could fix the
tarpaulin and stated that it would take a little over
an hour; that Witt hesitated; that he thought Witt was
going to say yes; that Witt then hollered to somebody
to take the carton out of the trailer and then he said,
"Put it over against the wall"; that plaintiff then
noticed the hiker, Bonelli, and said, "If you put that
against the wall, I don't think I can fix it." He stated
that in the deposition he also testified that he did not
know where Bonelli went, but presumed he went on the
tractor, to take the trailer away; that he next met

Bonelli in the back of the terminal, and that he had the truck up against the wall, with one end out 18 inches, and that Bonelli was standing at the door of his cab waiting for plaintiff; that Bonelli looked at him; that plaintiff came toward him; that plaintiff took a good look at the truck and saw he could get into the rear of it, and nodded his head O. K.; that the hiker then unhitched the tractor; that when plaintiff was examined at home in the taking of the pretrial deposition, he said, "Then he," referring to Witt, said, "Put it over against the wall. Then I noticed this hiker Paul [Bonelli] and I said 'If you put that against the wall I do not think I can fix it' ''; that in making the statement he was not addressing Bonelli; that when plaintiff reached the equipment the trailer and motor were connected; that Bonelli looked at him and plaintiff saw that the trailer was parked one end about 18 inches from the wall; that plaintiff "shook my head O. K. at Paul''; that he charged for time and material and sent regular bills about once a week, and was paid by check; that he did most of the repair work on the trailers in the yards, sometimes at either dock, sometimes up against the wall, and sometimes over in what was known as the "bone yard"; that most of the work was done at the dock; that he worked on both loaded and unloaded trucks; that at the time he started to work on the trailer where the injury occurred no trailers were parked to the west of it; that there was one on the east approximately 50 feet away; that there would have been room to park half a dozen trailers to the west of him against the wall; that when he started to work on the trailer he did not place any warning sign in front of or about the same; that he knew there were such signs on the premises.

Herman Witt, called by plaintiff, testified that at the time of the injury he was employed by defendant; that he left such employment around the first of June,

1937, having been employed for 7 years; that on the day of the injury he was employed as foreman, at 300 North Canal street, Chicago, the outbound terminal; that a Mr. Mason and Mr. C. R. Olson were his superiors, the former being general superintendent and the latter vice president, and that both had their headquarters at 300 North Canal street; that witness's duties were to see that the freight was loaded and unloaded; that his activities took him through the entire building; that in reference to the handling of trucks that were inbound with freight, ''the truck was spotted directly into that hole where the loading was done, whether it was the east or westbound or the east or the west platform. Local pick-up freight generally on the east platform which is the unloading dock. In the handling of the freight through the terminal preparatory to more shipment outbound, it was taken off of the units and trucked to wherever the freight was going, to whatever part of the building. The building itself was all laid out with signs, different men assigned to different trucks to unload. And during the day freight accumulated in certain portions of the building preparatory to definite outbound movement. My duties with reference to this was to see that it was moved properly. With reference to the vehicles themselves, my duties were to spot them in the different places where they were to be loaded. I told the drivers to what doors to back up to. With reference to the outbound freight if a load was loaded, we would pull it away from the platform and pull it against—we always used the phrase, 'Throw it against the wall.' Howard Cooper was there at that time, and was one of the men that assisted me. Most of the time I gave the orders, but if I did not happen to be at that particular place there was what we called a hiker around. Cooper or the checker would tell the hiker as he was walking by that that load is loaded and then it was the

hiker's duty to put the vehicle against the stone wall, which is the concrete wall on the North Western. The distance between the outbound loading platform and the North Western concrete wall is about 60 feet and vehicles were taken away from the loading platform and parked against the concrete wall instead of going right out on the run, before they left because the night drivers did not start work until seven o'clock at night. I had nothing to do with the condition of the vehicles so far as the tarpaulins and ropes were concerned. I became acquainted with the plaintiff, Byron Painter, I could not say when the first time was, but I saw him from time to time while he worked around the terminal, almost daily. I talked to him at different times about his work. The eastbound drivers—practically all of the drivers came on about seven o'clock and all of these were outbound out of Chicago. The driver got his instructions from the dispatcher if he was in his office, otherwise I would give out a load. Billy Ahrens was a dispatcher in the spring of 1936. The dispatcher's office was in the middle of the dock. The system of instructing the drivers in order to get them started and what load to take was that we just gave the number of the trailer and told them to couple up. I took a line-up every afternoon at four o'clock of the trailers that were loaded and what their destinations were and after four o'clock checkers would report to me as to what trailers they had loaded and they were ultimately added on to that same list. I gave instructions to Indiana drivers and Ohio drivers. At that time Cooper took care of the Scott drivers. I gave instructions to the Michigan drivers, which were 'just take a certain vehicle.' The steady drivers were assigned to certain tractors and the trailers were interchangeable with any tractor. The Michigan drivers reported around six o'clock. The only source of information to them was from me or from an order from the dispatcher's

office. The driver would couple up his trailer and go to the billing office to get his bills, report to the sealer, the sealer would come out and seal the load. He would get his individual bills for each shipment on each load out of the billing office. His next duty was then to see that the load was sealed and to start out on the highway. . . . The drivers did not receive orders from anybody else than the persons whose names I have mentioned. The officials who had charge of the condition of the tractors and trailers at that terminal were a yardman, a regular trailer man who inspected the trailers every morning. His name was John Norden. I had a talk with him on the afternoon of May 21, 1936, the day when Mr. Painter got hurt. I do not know where we were when we talked that afternoon— whether it was the east dock or the west dock. Q. Do you remember what the conversation was? A. That the tarpaulin on a certain trailer needed mending, and I could not spare it, because I had to send an open top trailer out on a pickup. Mr. Painter approached me about the tear and called my attention to it. My recollection is that the only thing further said in the afternoon conversation was that the trailer would be back later in the afternoon. I don't recall definitely any conversation around six o'clock because six o'clock was really a mad-house down there. At six o'clock all equipment would be in ready for unloading, all of the trucks would be up to the dock for unloading and it was a stress point where we had to show action. The situation with reference to the outbound trailers and tractors was that they were being loaded. There were not over 15 loaded in the afternoon up until that hour, and it was from six o'clock on, from 5:30 on that the heavy rush was of loading. I don't recall at the present time of having talked to Painter. I don't remember who was present at the six o'clock conversation. I cannot tell you what was said by me or Mr. Painter

at that time. If I recall the trailer about which I have been talking came in with practically a full load on it with the exception of a piece or two to be taken off and immediately those trailers then are thrown against the wall. The trailer was by my order put against the wall. I ordered it. I ordered one of the jockeys or hikers to do it and it might have been one of the eight that were there, all of whom were employed by the same company, which is the Illinois company. I did not see the jockey park the trailer against the wall. When the trailer came back at six o'clock it pulled in to the east platform. The wall is west of the west platform with no view through the terminal. I was on the east platform when I told the jockey to park it against the wall. Q. The purpose of having it parked against the wall was what? A. That trailer was loaded. Q. Anything to do with this repair job of Painter's? A. Not so far as I know. Q. Was that talked over, that that is where he was to go and sew up that tarpaulin? A. No. Q. When you say no, you mean what—it was not talked over? A. It was not talked over, so far as sewing up the tarpaulin against the wall there. I did not hear Painter say anything to me or to the jockey with reference to parking the trailer. I did not see the accident happen. I don't know what name was on the side of the trailer. The first information I got with reference to the accident was when someone came on the platform and told me that Painter was hurt. I did not have anything to do with the accident. To a certain extent I know about the operation of these tractors and trailers with reference to how they couple up. A trailer standing free with its own two wheels and two dolly wheels could be connected up if the driver will take a run at it. Otherwise the trailer would have to be blocked. There were no orders on trailers up against the wall. Every trailer at the dock, the driver was instructed to inspect

to see whether the tail gates were closed and tarpaulins tied; but so far as loaded trailers against the wall, that was done before putting against the wall by the checker. No orders were given to the driver about inspecting trailers against the wall. [Cross-Examination by Mr. Tuohy.] This wall where I instructed the hiker to spot this trailer is the wall that forms the foundation of the North Western Railway trestle."

Leo Paul Bonelli testified that he was employed by defendant as a hiker, mostly at the Canal street terminal, from 1934 until September, 1936; that he had four or five superiors there, namely, Witt, Viverito, Mason and Ahrens; that "the system of the company with reference to semi-trailers that came in to be unloaded was that they were disconnected or unhooked from the tractor on the east platform. When the trailer was loaded it was moved around to the west platform and the trailers disconnected again. While in the process of loading and unloading the trailers were taken away. I had something to do with parking of trailers against concrete wall. I do not remember being on the premises the day that Mr. Painter got hurt. May 26, 1936— I could not say whether I did anything to a trailer on which Painter subsequently worked. There were about eight of us hikers—Mr. Witt, Viverito and Mason issued the orders. The orders were that the trailers were supposed to be closed, the door, tail gates up and tarpaulins tied. The same orders were given as to trailers on the east and west platform—all trailers at the platform. Trailers against wall were all ready, tail gate up and tarpaulin tied, and everything complete to go. With reference to trailers upon which work was to be done, any work—I did not hear any orders given as to them. The trailer men do that themselves. I don't recall any conversation with Mr. Witt and Mr. Painter. I cannot say that I saw the trailer that was involved in Mr. Painter's accident. I

did not see the accident. I cannot say whether I parked the trailer against the wall.''

John Norden related that at the time of the trial he had been employed by defendant for 4 years as a trailer man; that his duties required that he inspect the trailers to see that they got repaired; that repair work has to do with torn canvas covers; that ''Painter was supposed to fix trailers wherever he could get ahold of them—where he could get at it. Occasionally he did repair work at the east platforms while trucks were being loaded and unloaded on the smaller jobs, and the larger jobs put them somewhere else—against the wall or if it was too big, took the canvas off, installing a new canvas and took the old canvas home for repair. With trailers parked against the wall, it is the same thing as patching up the small jobs, taking off the big jobs and taking them home and repairing them. The hikers around the yard did the parking of the trailers against the wall. Part of my work was to oversee what he did. I had charge of okeying his bills. The trailers that go out on the highways, sometimes are spotted against the wall without the tailgate being properly closed, or door, or even the tarpaulin not being tied. In that case the driver is supposed to pull up in front and have his job sealed. When he has his job sealed, there is a man that seals those jobs, and he will see that, and he will have somebody close those doors properly. Trailers parked against the wall for repair purposes were not parked at the instructions or orders of any particular men at the terminal. They were parked wherever they could find room to park them when they were loaded for repair purposes, it all depends. If it was a big job, as I said, it was sent to the garage. At that time they were all OK. Q. In the repairing of canvases on trailers when they were parked against the wall, were there any instructions given by anybody as to how they were to be parked or

where parked? A. No. My orders were that the trailers had to be parked straight at all times. I never saw them parked with the corner against the wall. I was there the day this accident happened. I did not exactly see it. I was somewhere about thirty feet away from the accident, on the opposite side of the driveway changing an axle on a trailer. When I speak of the driveway I mean that the trailer was backed against the platform and the tractor was stuck underneath the trailer and I was changing an axle just opposite where the accident occurred, which was just across the yard from where the trailer Painter was working on had been parked. I did not see Painter on the trailer on which he was working before the accident happened. There were two trailers parked across from me against the wall. The first thing I heard was Mr. Painter holler for help. I heard the connecting up of the tractor. I heard the roar of the tractor going underneath the trailer and just as it happened Mr. Painter hollered for help. When I got over there I saw Mr. Painter being pinched between the trailer and the wall. He was standing on a small step ladder in back of the trailer and the trailer was pushed against the wall and crushed his leg. That is all I could see and the step ladder. The tractor had not made full connection with the king-pin. When I got over there the tractor was flattened out straight against the wall. Mr. Painter was as near to the center of the tractor as I could judge. I hollered at the driver that there was a man behind the trailer pinched and there was no means of getting him out, so I ran for a chain, hooked the chain around the tractor and trailer and pulled the trailer ahead. When I got there I used the same tractor with the chain to pull the trailer away from the wall. I didn't pay any attention to the condition of the tarpaulins or the ropes at the back of the trailer. It was in broad daylight around six o'clock but I did not see

the accident itself. [Cross Examination by Mr. Tuohy.] Q. Was there a trailer on either side of the trailer on which Mr. Painter was working? A. Well, I couldn't say that definitely. I know there was a trailer parked, for the simple reason we all parked our trailers—we had very little space, and we always lined them up close to that wall. I heard the tractor pulling in the driveway. I heard him back up to it—that is, when he is about to back up to the trailer he guns his motor and that roaring sound I heard. [Re-direct Examination by Mr. Hulbert.] Q. 'Gunning the motor'—you mean by that— A. Applying— Q. Picking up speed? A. Yes; so he can hit the trailer. [Re-cross Examination by Mr. Tuohy.] Q. That makes considerable noise, does it? A. Yes.''

Howard Cooper testified that in May, 1936, he was a checker at the Canal street terminal; that his duties were over the whole terminal, checking freight and loading eastern trucks; that when the freight came in off a pickup truck it was delivered by the truckers to the place where it was to be loaded to the destination; that the trucker would bring it down to the trailer and the checker by the trailer would load it into the trailer; that he saw plaintiff doing repair work on tarpaulins; that ''the dispatcher in our end had charge of the eastern division. They would spot a trailer for Toledo, Cleveland, Pittsburgh, Akron, Buffalo and New York City. These were the trailers spotted in the holes. Mr. Witt and Mr. Viverito were the ones who had charge of spotting the trailers into proper place and the dispatcher got his information from the record kept by Witt or Viverito. I saw Mr. Painter working frequently around the premises from October, 1935 to May of 1936. I have seen him doing his work, mostly on the west wall, because I was located on the west side of the dock. Occasionally I saw him doing work on vehicles at the platforms. If it did not interfere

with the men's work that were loading the trailer, he could get up on the front or tie ropes on the side as long as it did not interfere with the men. There were no men working on vehicles along the concrete wall. At times while he was doing his work there were drivers down there while he was working on vehicles at the concrete wall. I was located at the northeast end of the building. Witt and Viverito would be up and down the terminal all day long. I was working right under the viaduct where the Northwestern trains went over. Witt and Viverito were at the south end most of the time, but their days carried them back and forth in the whole terminal. I did not see the accident.''

James Mason related that he was superintendent at defendant's terminal; that he was in full charge of the terminal; that he knew of Painter's employment to repair tarpaulins; that the dispatchers were directly responsible for which equipment drivers would take; that there were no places allotted to Painter to do his work; that he would do it wherever the trailer happened to be; ''Q. What is the fact, Mr. Mason, with reference to whether or not there were signs available there for men who were working in dangerous places—warning signs? A. We had; what it was was a round sign which would rest right in front of the trailer was used for changing tires or work on lights. Any place where a man would be in a danger position and it read: 'Danger. Men Working' or 'Man Working.' The signs were kept at our gas station, sort of a mechanical room, in the same yard where the accident happened. At one time there had been a bulletin out to our men whenever working on equipment they would put them in that position to use the sign without fail, but it was more or less taken for granted by all the men and the men that knew they were going to be in such a position would immediately

grab one of the signs and place it. [Re-direct Examination by Mr. Hulbert.] I had seen the signs put up time and again before May 21, 1936 time and again by our own employees."

The burden was on plaintiff to establish his case as stated in the amended complaint. That obligation required plaintiff to show that defendant, by its servants, negligently drove the motor tractor in violent collision with the trailer, crushing plaintiff, and that at and about such time plaintiff was in the exercise of due care for his own safety. It is not contended that the case comes within the *res ipsa loquitur* rule. We cannot agree with the argument of plaintiff that the failure of defendant to call the driver created a presumption that if he had been called he would have established the negligence charged. The burden rested on plaintiff at all times, and there was no duty on defendant to call any witnesses.

We now come to the ultimate question to be determined, namely, does the evidence in favor of plaintiff, standing alone, and considered to be true, together with the inferences which may legitimately be drawn therefrom, warrant the judgment. Under proper instructions the jury has decided in the affirmative, and our inquiry searches the trial record to ascertain whether, under the rule last mentioned, the evidence, and legitimate inferences drawn therefrom, sustain the verdict. Viewing the factual situation with this rule in mind, it will be noted that there is evidence that the foreman, drivers, hikers and laborers employed at the terminal knew that plaintiff was working there, repairing damaged tarpaulin and ropes; that on the day when he was injured plaintiff twice talked to Herman Witt, the foreman, about repairing damaged tarpaulin and ropes on the trailer; that Witt knew plaintiff would be occupied for more than an hour in doing the repair work; that Witt saw the rips and torn ropes and knew

that plaintiff would be working at the rear of the trailer at some time during the period; that Leo Paul Bonelli, the hiker, also knew that plaintiff would be working at the rear end of the trailer; that Bonelli parked the trailer so that one corner was about 18 inches from the wall; that both Witt and Bonelli knew that plaintiff at some time during the period would be in the space between the rear of the trailer and the wall. On cross-examination plaintiff stated that at around 6 p. m., when he asked Witt if he could then repair the tarpaulin, Witt directed some laborers to "take that carton out of that truck and put it over against the wall"; that Witt said, "Park that against the wall," and plaintiff said, "If you park that against the wall I can not get at it"; that with that Bonelli, the hiker, stepped from behind and to the right of Witt and jumped off the dock, and the trailer pulled out; that plaintiff did not know that Bonelli was behind Witt. Interrogated as to a pretrial deposition, taken at his home, plaintiff testified that in such deposition he stated that when he asked Witt if he could then fix the tarpaulin, having stated that his time in so doing would be occupied for a little over an hour, Witt ordered an employee to "take that carton out of that trailer"; that then Witt said, "Put it over against the wall"; that then plaintiff noticed the hiker, Paul, and said, "If you put that against the wall, I don't think I can fix it." Plaintiff stated further that in the deposition he testified, "We broke up then. I don't know where Paul went. I presume he went on the tractor, to take that trailer away. Oh, I met him in the back of the terminal, and he had that truck up against the wall, one end out 18 inches, and he was standing at the door of his cab, waiting for me I presume; and he looked at me. I came right toward him. I took a good look at the truck, and I saw I could get in the rear of it, and I nodded my head O. K. He then unhitched his tractor." Plaintiff, on cross-examination, further tes-

tified that "I was talking to both at the time I was talking to Mr. Witt. Paul I had nothing to do with. Q. Well, did you say, when you were examined at your home as part of your answer: 'Then he,' referring to Witt, said 'Put it over against the wall. Then I noticed this hiker Paul, and I said "If you put that against the wall I do not think I can fix it." ' A. I was not addressing that to Paul."

Defendant urges that plaintiff not only placed himself in a position of existing danger but that he created the position of danger by his direction to the hiker as to how the trailer should be spotted. Witt and Bonelli testified that they did not hear plaintiff say anything about parking the trailer. Whether the remark of plaintiff that if the trailer was parked against the wall plaintiff could not get at it, was heard by Witt or Bonelli, was a question for the jury to resolve. Likewise, whether the hiker took the silence of Witt to mean his assent that the trailer was to be placed in a position other than flush against the wall, was for the jury to determine. The jury observed the witnesses, their facial expressions and their demeanor, and was in a better position than this court to determine what actually did take place. The order for the placing of the trailer was given by Witt and executed by Bonelli. Witt was Bonelli's superior, and after the former had spoken the latter jumped off the platform and drove the tractor and trailer away. It would be reasonable to infer that he took the silence of Witt as an indication that the trailer was to be parked other than flush against the wall. After Bonelli drove away plaintiff procured a ladder and went over to where the trailer had been parked. The situation at that time was that the foreman had given an order for the parking of the trailer and the order was carried out. Defendant invites attention to the conduct of plaintiff at the time the tractor was uncoupled from the trailer and nodded "O. K.," and argues that such actions, when con-

sidered with all the other evidence, show that plaintiff directed the placing of the trailer with one corner thereof 18 inches from the wall, and that, hence, plaintiff not only directed that the trailer be placed in such position but in effect countermanded the order of Witt to "throw it against the wall." From a careful consideration of the conduct and words of the witnesses at the platform and at the trailer we are satisfied that the evidence justified the jury in finding that defendant, through its servants, and not plaintiff, directed the placing of the trailer in the position that it was in at the time of the accident. The orders for the parking of the trailer were issued and executed by defendant's employees, who knew that plaintiff, in the performance of his duties as an independent contractor, might be working on the ladder between the trailer and the wall; that he might be concealed from view, and that he would be working on and about the trailer for more than an hour. Defendant insists that the fact that plaintiff did not utilize the warning signs shows that he did not exercise due care. There was testimony that the signs were for the use of defendant's employees. Plaintiff argues that it does not appear that he had access to the signs. The jury had a right to consider such testimony in determining the issues. We again point out that defendant's employees knew that plaintiff would be working on and about the trailer for more than an hour and that he might be concealed from view between the rear of the trailer and the wall. Having that knowledge, one of defendant's employees, nevertheless, backed the tractor with great force against the trailer, and thereby injured plaintiff. There was competent evidence from which the jury had the right to find that defendant, by its servants, carelessly and negligently drove a motor tractor into violent collision and contact with the front end of the trailer, causing the injuries complained of, and that

at and about such time plaintiff was in the exercise of due care for his own safety. The evidence in favor of plaintiff, together with inferences which may legitimately be drawn therefrom, presented questions of fact for the jury as to negligence and due care, and we should not interfere with the verdict.

From a careful consideration of the evidence we are impelled to hold that the court properly overruled the motion for a judgment notwithstanding the verdict. Therefore, the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

FRIEND, P. J., and JOHN J. SULLIVAN, J., concur.